## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SIDNEI SILVA,

      Plaintiff,

v.

COBB COUNTY, GEORGIA, and
CLINTON MONAHAN, in his
individual and official capacities,

      Defendants.

CIVIL ACTION FILE

NO. 1:16-CV-3201-MHC

## <u>ORDER</u>

This case comes before the Court on Defendants Cobb County, Georgia (the

"County"), and Officer Clinton Monahan's Motion for Summary Judgment [Doc.

39]. For the following reasons, Defendants' motion is **GRANTED IN PART and**

**DENIED IN PART**.

## I.    BACKGROUND[1]

---

[1] At the outset, the Court notes that as this case is before it on Defendants' motion
for summary judgment, the Court views the evidence presented by the parties in
the light most favorable to Plaintiff and has drawn all justifiable inferences in favor
of Plaintiff. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587
(1986); Sunbeam TV Corp. v. Nielsen Media Research, Inc., 711 F.3d 1264, 1270
(11th Cir. 2013). In addition, the Court has excluded assertions of facts that are
immaterial or presented as arguments or legal conclusions or any fact not

On April 12, 2015, Plaintiff Sidnei Silva ("Silva") was driving home from work when he noticed a woman, Katie Sundseth ("Sundseth"), texting while driving with several children in her car. Dep. of Sidnei Silva taken May. 13, 2017 [Doc. 60] ("Silva Dep.") at 17-21. Silva looked at Sundseth and "shook [his] head" in disapproval as he passed. Silva Dep. at 18-19.

Sundseth ultimately followed Silva to his home, where she parked behind his van and "started cussing [Silva] out," thus prompting Silva to begin recording the event on his cell phone.[2] Silva Dep. at 21-22. When Sundseth saw Silva recording her, she became angry and threatened to call the police, which Silva encouraged her to do. Silva Dep. at 23-24; see First Silva Video at 00:00:00-00:00:10. Sundseth called the police and stated that she was being harassed and detained against her will. First Silva Video at 00:00:35-00:02:45.

---

supported by citation to evidence (including page or paragraph number). LR 56.1B(1), NDGa. Further, the Court accepts as admitted those facts in the statements that have not been specifically controverted with citation to the relevant portions of the record by Plaintiff. LR 56.1B(2), NDGa.

[2] Silva has produced two videos of this incident taken from his cell phone. See Videos Clips, attached as Exs. 1 & 2 to Silva Dep. The first video (hereafter "First Silva Video") depicts a portion of Silva's interaction with Sundseth, while the second (hereafter "Second Silva Video") depicts a portion of his interaction with police officers, including Defendant Monahan.

Toward the end of the recording of Sundseth, Silva can be overheard to state, "I'm going to have to stop recording because I have—I don't have much storage left." First Silva Video at 00:02:35-00:02:45; see also Silva Dep. at 34. Silva sent the video of Sundseth to his email account while he was waiting for the police to arrive. Silva Dep. at 35.

Shortly afterwards, Cobb County Police Officers Amanda Smith ("Smith") and Clinton Monahan ("Monahan") arrived at the scene. See generally Second Silva Video. Silva also recorded this encounter on his cell phone; the video begins as Silva and Sundseth (who up to that point had been seated in her car) approach Monahan and Smith, both of whom exit their patrol cars immediately upon arrival. The following exchange is captured in the video:

Smith [to Silva]:  Get back in your van.

Silva:  Oh, I live right here.  I don't need to get back in my van.

Monahan:  I'm telling you to get back in your van.

Silva:  Sir, I'm recording everything.  This lady was . . .

Monahan [speaking over Silva]:  That's cool, I'm telling you to get in your van.

Silva [attempting to speak]:  This lady . . .

Monahan:  Get in your van right now.

Silva:  This lady was following me . . .

3

Monahan [yelling]:  Okay, we'll deal with that later.  Get in your van.

[Monahan can be seen to put his hand on what appears to be Silva's chest and to begin pushing Silva towards his van.]

Silva:  Okay.  Don't push me.  Why are you pushing me?

Monahan [continuing to push Silva towards his vehicle]: Because I'm in charge right now.  Get in your van.

[Silva can be seen opening the door to his van as Monahan continues pushing him.]

Silva:  Okay.  Don't push me.  Don't push me.  Don't push me.

Monahan:  Get in your van and take a seat.

[The driver's side door of Silva's van can be heard to open, and it appears Silva reaches into his van.]

Smith [standing behind Monahan] [yelling]:  What are you reaching for?

Silva:  My van . . . oh, my wallet.

Monahan:  Wallet, wallet, wallet.  We need your ID.

Silva:  I don't need to give . . . I'll give my ID.  I don't need to give you my wallet.  This crazy lady was following me after she was texting, and I was shaking my head, and she . . .

Monahan:  ID.

Silva:  No, hold on.

Monahan [yelling]:  No.  I'm asking for your ID.  You give me your ID.

4

Silva [attempting to speak]: ... after I talk to her . . .

Monahan:  You ever heard of obstruction?  ID.

Silva [stammering]:  . . . she came over.

Smith: Give him your ID.

Silva [stammering]:  . . . she came . . .

Smith:  I didn't ask for your side of the story yet.

[In the back of the frame, Monahan can be seen walking away from Silva towards Sundseth's vehicle.   Meanwhile, Smith remains standing in front of Silva.]

Silva [raising his voice]:  Okay.  You guys really scare me.  You guys really scare me . . .

Smith [speaking over Silva]: We're not trying to scare you.  We're here to protect everybody, including her.  [Smith gestures towards Sundseth].

Silva:  Really, including her?  She was following me like a crazy lady.

[At this point in the video, Silva appears to be standing immediately outside the front door of his van rather than sitting inside it.]

Smith: Get in your van [pointing at Silva's van].  Get in your van. Get in your van.

Silva:  Really?

Smith:  Get in your van.

Silva:  Ok, I'll get in my van.  I'll get in my van.

Smith:  Then do it.

[Silva can be heard to get in his van and appears to sit in the front seat.  Smith can be seen walking away towards Sundseth's vehicle.]

Silva [speaking to Smith as she walks away]:  But you guys really scare me.  I'll make a point you guys don't scare me at all.

[Silva sits in his van for approximately two seconds.  Neither officer is present.]

Monahan [in the background, yelling to Silva]: Hey, come on out here for a second.

Silva [appearing to remain in his van]: Excuse me?

[Silva turns the camera towards Monahan, who can be seen walking towards Silva]

Monahan [continuing to approach]: Come on out here.

Silva [walking towards Monahan]: Go ahead.

Monahan: Put your phone down, I need you to put your phone down.

Silva: No, I'm not going to put my phone down.

Monahan [yelling]: Put your phone down.

Silva: Why am I going to put my phone down?  Why am I going to put my phone down?

[At this point, the camera becomes shaky and then appears to fall to the ground, and the sound of a struggle is audible.  For the remainder of the video, the camera moves about rapidly and it is not possible to see any of the events taking place.]

Monahan:  Stop resisting.

Silva:  Who's resisting?

Monahan:  You are.

[Smith can be heard to rush towards Silva and Monahan as a struggle is still heard in the background.]

Smith [yelling]:  Get on the ground.  I will tase you.

Silva [yelling]:  Jamie!  Jamie!

Smith:  Hands behind your back.  [Video ends.]

Second Silva Video at 00:00:10-00:01:37.  In total, approximately one minute and thirty seconds elapse between when officers arrive and when Silva is subdued.

Silva testified that when Monahan approached him in the video after telling Silva to put the phone down, Monahan tried to take the phone out of Silva's hands and both Smith and Monahan "push[ed] me to the ground."  Silva Dep. at 41-42. When Smith was "pulling me out from the ground," Silva states he saw Monahan "mess with my phone."  Id. at 39.  Moreover, Silva testified that Monahan kept the cell phone for a period of time and that by the time Monahan returned the phone to Silva, it was cracked in the corner, probably from falling to the pavement during the scuffle with Monahan.  Id. at 39-40, 43.  Silva contends that he never tried to resist Monahan's actions.  Id. at 43.

After Silva was handcuffed and placed in Smith's patrol car, Smith drove Silva to the police station.  Id. at 45.  On the way to the jail, Silva tried to explain to Smith that Sundseth was the aggressor and that he recorded Sundseth when she

arrived at his house. Id. at 47. Smith then asked to see the recording, but Silva could not find the recording on his phone, telling Smith "he [Monahan] did something on my phone." Id. at 47-48. Silva told Smith he had sent the Sundseth video to his email address, and Smith was then able to view the recording, causing her to change her opinion as to what had occurred between Silva and Sundseth. Id. at 48-49, 52-53. Silva said that the second video was also removed from his cell phone, and he was only able to subsequently recover it through the assistance of a representative of his carrier, AT&T. Id. at 49-52.

Although Silva was initially arrested for false imprisonment, disorderly conduct, and reckless driving, these charges were dropped after police concluded that Sundseth (against whom no charges were ultimately brought) had been the aggressor in her interaction with Silva; instead, Silva was charged only with obstruction. Decl. of Amanda Smith [Doc. 43-1] ("Smith Decl.") ¶ 35; see also Incident/Investigation Report [Doc. 46-2] ("Incident Report") at 4. However, a *nolle prosequi* was entered as to the obstruction charge on October 12, 2015, after the Assistant Solicitor General for Cobb County concluded that the State "[could] not prove guilt beyond a reasonable doubt." See Entry of *Nolle Prosequi* [Doc. 46-3]; Defs.' Statement of Material Facts [Doc. 40-1] ("Defs.' SMF") ¶ 75; Pl.'s Am. Resp. to Defs.' SMF [Doc. 61-1] ¶ 75.

8

In his Complaint, Silva alleges that Monahan lacked probable cause to arrest him for obstruction and, further, that Monahan used excessive and unreasonable force in executing Silva's arrest by "[throwing] him to the pavement, wrench[ing] his arms behind his back, handcuff[ing] him, and put[ting] him in the back of a patrol car," as a result of which Silva alleges he sustained "significant" injuries requiring medical treatment.  Compl. [Doc. 1] ¶¶ 19-20; see also Silva Dep. at 56-61.  Silva also alleges that, after he was on the ground, Monahan took his phone, searched through it without a warrant, and deleted the two above-referenced videos in violation of his First, Fourth, and Fourteenth Amendment rights.  Compl. ¶¶ 22-24, 30; see also Silva Dep. at 39-44.

Silva now brings the following claims:

- Count One: Violation of the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against the County and Monahan in his official and individual capacities, based on Monahan's interference with Silva's right to videotape police conduct.  Compl. ¶¶ 31-37.

- Count Two: Violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against the County and Monahan in his official and individual capacities, based on Monahan's (1) warrantless

9

search of Silva's cell phone, (2) arrest of Silva without probable cause, and (3) use of excessive force in executing that arrest. Id. ¶¶ 38-45.

- Count Three: False imprisonment against Monahan in his official and individual capacities, based on his arrest of Silva without probable cause. Id. ¶¶ 46-48.

- Count Four: False arrest against Monahan in his official and individual capacities, based on the allegation that Monahan knew that the claims upon which Silva's arrest was based were false. Id. ¶¶ 49-51.

- Count Five: Punitive damages against Monahan in his official and individual capacities. Id. ¶¶ 52-54.

Defendants have moved for summary judgment on all claims.

## II.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment has the burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions," and cannot be made by the district court in considering whether to grant summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the party opposing summary judgment must present evidence that shows there is a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law.  Celotex, 477 U.S. at 324.  In determining whether a genuine issue of material fact exists to defeat a Motion for Summary Judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that opposing party.  Anderson, 477 U.S. at 255; see also Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. Anderson, 477 U.S. at 248.  A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.  Id.

"If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

11

non-moving party," summary judgment for the moving party is proper.

Matsushita, 475 U.S. at 587.

## III.   DISCUSSION

### A.   Silva's Constitutional Claims for Relief (Counts One and Two)

#### 1.   Claims Against Cobb County and Monahan in His Official Capacity

"It is well established that [42 U.S.C. §] 1983 itself creates no substantive

rights; it merely provides a remedy for deprivations of federal rights established

elsewhere." Wideman v. Shallowford Cmty. Hosp., Inc., 826 F.2d 1030, 1032

(11th Cir. 1987) (citing City of Okla. City v. Tuttle, 471 U.S. 808, 816 (1985)).  To

sustain a cause of action based on section 1983, a litigant must establish two

elements: (1) that he suffered a deprivation of a right, privilege, or immunity

protected by the U.S. Constitution or federal law, and (2) that the act or omission

causing the deprivation was committed by a person acting under color of state law.

Livadas v. Bradshaw, 512 U.S. 107, 132 (1994); Arrington v. Cobb Cty., 139 F.3d

865, 872 (11th Cir. 1998).  "[S]ection 1983 imposes liability only 'for violations of

rights protected by the Constitution, not for violations of duties of care arising out

of tort law.'" Wideman, 826 F.2d at 1032 (quoting Baker v. McCollan, 443 U.S.

137, 146 (1979)).  Accordingly, "[i]n any § 1983 action, a court must determine

'whether the Plaintiff has been deprived of a right secured by the Constitution and

12

laws of the United States.'" Glenn v. Brumby, 663 F.3d 1312, 1315 (11th Cir. 2011) (quoting Baker, 443 U.S. at 146). "Absent the existence of an underlying constitutional right, no section 1983 claim will lie." Wideman, 826 F.2d at 1032.

In addition, a suit against an official of the government in his or her official capacity is deemed to be a suit against the entity that employs the official. Ky. v. Graham, 473 U.S. 159, 165-66 (1985); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1309 (11th Cir. 2009) (citing Brown v. Neumann, 188 F.3d 1289, 1290 (11th Cir. 1999)). Thus, Plaintiff's suit against Monahan is the functional equivalent of suing Cobb County. Butler v. Prison Health Servs., 294 F. App'x. 497, 499 (11th Cir. 2008).

A plaintiff seeking to hold a local government such as Cobb County liable under Section 1983 cannot rely upon the theory of *respondeat superior*; instead, liability must stem from the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy . . . ." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978); see also Denno ex rel. Denno v. School Bd. of Volusia Cty., 218 F.3d 1267, 1276 (11th Cir. 2000) (citing Monell, 436 U.S. at 694). Because a county is "liable under section 1983 only for acts for which the [county] is actually responsible," Marsh v. Butler Cty., 268 F.3d 1014, 1027 (11th

13

Cir. 2001) (en banc), Silva "must identify a municipal policy or custom that caused

. . . injury." Grech v. Clayton Cty., 335 F.3d 1326, 1329 (11th Cir. 2003) (citation

and internal punctuation omitted).

> To establish a policy or custom, it is generally necessary to show a
> persistent and wide-spread practice. Moreover, actual or constructive
> knowledge of such customs must be attributed to the governing body
> of the municipality. Normally random acts or isolated incidents are
> insufficient to establish a custom or policy.

Depew v. City of St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986). A plaintiff

must show that the county's custom or practice is "the moving force behind the

constitutional violation." City of Canton v. Harris, 489 U.S. 378, 389 (1989)

(internal punctuation and citation omitted). A plaintiff "has two methods by which

to establish a county's policy: identify either (1) an officially promulgated county

policy or (2) an unofficial custom or practice of the county shown through the

repeated acts of a final policymaker for the county." Grech, 335 F.3d at 1329

(citing Monell, 436 U.S. at 690-91); see also Mandel v. Doe, 888 F.2d 783, 793

(11th Cir. 1989) ("Under this theory of municipal liability, the first step of the

inquiry is to identify those individuals whose decisions represent the official policy

of the local governmental unit.").

Silva's Complaint alleges generally, and without further elaboration, that all

of Monahan's allegedly unconstitutional conduct (as set forth in Counts One and

14

Two of the Complaint) is "the product of the County's unlawful customs, policies, and practices." Compl. ¶¶ 36, 44. In support of this claim, Silva relies in large part on what he calls the "Cupid Memo," a document produced in July of 2015 by Cobb County Commissioner Lisa Cupid after she was suspected of theft and followed home in her vehicle (though never pulled over or arrested) by an undercover police officer. See Cupid Mem. [Doc. 53-3] ("Cupid Memo"). Upset by the incident, Cupid subsequently authored the memo—which was addressed to Cobb County leadership, and is styled as an open letter—to "educate" her fellow commissioners on the incident, seek "swift and remedial action" concerning the Cobb County Police Department's practice of tailing vehicles suspected of being involved car burglaries (as Cupid's had been on the evening in question), and urge consideration of "what steps need to be taken to restore persons and communities who become subject to [similar] activity[.]" Cupid Memo at 1. The memo consists of a lengthy narrative description of the evening in question, a number of "outstanding questions" concerning police practice, and a variety of Cupid's editorial "observations" concerning what she believed to be the impropriety of police conduct—including Cupid's belief that the type of "provocation" to which she was subject was "protocol and prevalent." See id. at 5.

15

Silva characterizes Cupid's memo as an "admission" that Cobb County "has a widespread practice of violating constitutional rights." See Pl.'s Am. Opp'n to Defs.' Mot. for Summ. J. [Doc. 61] ("Pl.'s Opp'n") at 8-9.  But Cupid's memo is no such thing; instead, it is best characterized as an open letter or public complaint concerning a single incident of alleged police misconduct.  Silva has produced no evidence that any Cobb County official ever conceded that the police conduct that gave rise to Cupid's memo was unlawful, that Cupid took any legal action as a result of the incident, or that the underlying conduct was ever determined to be "widespread" or to violate constitutional rights.  To the contrary, it appears that, in response to Cupid's Memo, Cobb County Public Safety Director Sam Heaton conducted an investigation into the incident.  See Sam Heaton, Investigative Report, Cobb County Department of Public Safety, available at https://cobbcounty.org/images/documents/DPS/Commissioners_Investigative_Rep ort.pdf ("Heaton Report").[3]  Heaton's report concludes that, although Cupid's experience "reflect[ed] an unfortunate series of events that occurred over a few minutes that inadvertently frightened Commissioner Cupid," the officers involved

---

[3]  Though neither party has offered the Heaton Report into the record, "[t]he Court is permitted to take judicial notice of documents made publicly available by a government entity." Thomas v. Alcon Labs., 116 F. Supp. 3d 1361, 1365 (N.D. Ga. 2013) (quoting Henderson v. Sun Pharm. Indus., Ltd., 809 F. Supp.2d 1373, 1379 n.4 (N.D. Ga. 2011)).

nevertheless "acted within departmental policies and guidelines," and recommends that officers be better "made aware of how an unmarked vehicle may be perceived in today's world of car-jackings, hit-and-run robberies, and other similar crimes." Id. at 16.  Additionally, the Cupid Memo appears to concern police officers' practice of using unmarked cars to tail those suspected of burglaries.  See Cupid Memo at 4-5.  Therefore, the Cupid Memo appears unrelated to any of the alleged police misconduct at issue in this case.

Silva also asserts that Cupid's experience is "part of a pattern of civil rights violations," see Pl.'s Opp'n at 6, which he bases upon a 2014 civil complaint filed in this district against Cobb County.  See Complaint, Barnes v. Cobb Cty., No. 1:14-CV-948-TWT) (Mar. 31, 2014).  In that case, the plaintiff alleged that she was falsely arrested, falsely imprisoned, maliciously prosecuted, and harassed by Cobb County police after she cursed at police officers while riding her bicycle along a public street.  See id. ¶¶ 13-55.  However, it appears that Barnes was settled and ultimately dismissed before any of the plaintiff's factual allegations were considered by the court; furthermore, Silva fails to explain how the facts alleged in Barnes—even if assumed to be true—relate to the specific allegations in this case.  See City of Okla. City v. Tuttle, 471 U.S. 808, 841 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under

Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.") (citation and quotation omitted); Grech, 335 F.3d at 1330 n.6 ("A single incident would not be so pervasive as to be a custom or practice.").

Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** with respect to Silva's Counts One and Two against the County. Additionally, because Silva's claims in Counts One and Two against Monahan in his official capacity are treated as claims against Cobb County, these claims fail as well. Molette v. Georgia, 469 F. App'x 766, 768 (11th Cir. 2012). Defendants' Motion for Summary Judgment also is **GRANTED** as to Silva's Counts One and Two against Monahan in his official capacity.

### 2.  Individual Capacity Claims—Officer Monahan

Defendants contend that Monahan is entitled to qualified immunity on all of Silva's federal claims brought against him in his individual capacity. "Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting

18

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To claim qualified immunity, a

defendant must first show he was performing a discretionary function.  Moreno v.

Turner, 572 F. App'x 852, 855 (11th Cir. 2014) (citing Whittier v. Kobayashi, 581

F.3d 1304, 1308 (11th Cir. 2009)).  There is no dispute that Monahan was acting in

the scope of his discretionary authority in this case.  See, e.g., Crosby v. Monroe

Cty., 394 F.3d 1328, 1332 (11th Cir. 2004) (holding that because "making an arrest

is within the official responsibilities of a sheriff's deputy," a deputy making an

arrest is performing a discretionary function).

    "Once discretionary authority is established, the burden then shifts to the

plaintiff to show that qualified immunity should not apply."  Edwards v. Shanley,

666 F.3d 1289, 1294 (11th Cir. 2012) (quoting Lewis v. City of W. Palm Beach,

561 F.3d 1288, 1291 (11th Cir. 2009)).  A plaintiff demonstrates that qualified

immunity does not apply by showing: "(1) the defendant violated a constitutional

right, and (2) the right was clearly established at the time of the alleged violation."

Kobayashi, 581 F.3d at 1308.  A constitutional right is clearly established "only if

its contours are 'sufficiently clear that a reasonable official would understand what

he is doing violates that right.'"  Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir.

2003) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "When we

consider whether the law clearly established the relevant conduct as a

19

constitutional violation at the time that [the government official] engaged in the challenged acts, we look for 'fair warning' to officers that the conduct at issue violated a constitutional right."  Jones v. Fransen, 857 F.3d 843, 851 (11th Cir. 2017) (citing Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)).

There are three methods to show that the government official had fair warning:

> First, the plaintiffs may show that a materially similar case has already been decided.  Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation.  Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary.  Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant state supreme court].

Terrell v. Smith, 668 F.3d 1244, 1255-56 (11th Cir. 2012) (citations, quotation marks, and alterations omitted).

The first method "looks at the relevant case law at the time of the violation; the right is clearly established if 'a concrete factual context [exists] so as to make it obvious to a reasonable government actor that his actions violate federal law.'"  Fils v. City of Aventura, 647 F.3d 1272, 1291 (11th Cir. 2011) (alterations in original) (quoting Hadley v. Gutierrez, 526 F.3d 1324, 1333 (11th Cir. 2008)).  While the facts of the case need not be identical, "the unlawfulness of the conduct must be apparent from pre-existing law."  Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011); see also Gennusa v. Canova, 748 F.3d 1103, 1113 (11th Cir.

2014) ("We do not always require a case directly on point before concluding that the law is clearly established, but existing precedent must have placed the statutory or constitutional question beyond debate.") (internal quotation marks omitted)).

The second and third methods, known as "obvious clarity" cases, exist when "case law is not needed" to demonstrate the unlawfulness of the conduct or where the existing case law is so obvious that "every reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Vinyard v. Wilson, 311 F.3d 1340, 1350-51 (11th Cir. 2002. Such cases are rare. See, e.g., Santamorena v. Georgia Military College, 147 F.3d 1337, 1340 n.6 (11th Cir. 1998) (noting that "these exceptional cases rarely arise").

This Court applies Monahan's qualified immunity defense to each count separately.

### a.  Count One (Violation of First and Fourteenth Amendments)

Silva alleges that Monahan violated his First and Fourteenth Amendment rights by preventing him from videotaping police conduct (and then later by taking his cell phone and deleting the above-referenced video of Silva's interaction with

Monahan).  Compl. ¶¶ 33-34; see also Silva Dep. at 36-39, 42-43.[4]  Until Silva was

instructed by Monahan to "[p]ut your phone down," Silva was not prevented from

filming the two officers (which is borne out by the video reviewed by the Court).

However, once Silva was instructed to come out of his van and continued to film

the scene, the video clearly shows that Monahan instructed Silva to put his phone

down twice before the struggle between them ensued.  Silva has testified that

Monahan then grabbed his phone and retained it, deleting the two videos before

returning the phone to him.

It is clearly established law that a person "ha[s] a First Amendment right,

subject to reasonable time, manner and place restrictions, to photograph or

videotape police conduct.  The First Amendment protects the right to gather

information about what public officials do on public property, and specifically, a

right to record matters of public interest."  Smith v. City of Cumming, 212 F.3d

1332, 1333 (11th Cir. 2000); see also Bacon v. McKeithen, No. 5:14-CV-37-RS-

CJK, 2014 WL 12479640, at *4 (N.D. Fla. Aug. 28, 2014) (finding defendant's

right to videotape a police officer without his consent at a traffic stop was clearly

established in light of Eleventh Circuit's "recogni[tion] [of] this right well over a

---

[4] At his deposition, Silva also alleged that Monahan deleted three unrelated photos
from his phone.  Silva Dep. at 37.

decade ago.") (citing <u>Smith</u>, 212 F.3d at 1333).  Monahan is not entitled to

qualified immunity if he prevented Silva from videotaping police conduct.  <u>See,</u>

<u>e.g.</u>, <u>Abella v. Simon</u>, 522 F. App'x 872, 874 (11th Cir. 2013) (trial court did not

err by refusing to apply qualified immunity where sufficient facts were alleged to

show that officers arrested the plaintiff in retaliation for photographing officers).

In deciding claims of qualified immunity, the Court must base its decision on "the

plaintiff's version of the facts."  <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir.

2002).  Based upon the second video and Silva's version of the facts, there is

evidence in the record which could lead a fact finder to determine that, at some

point during the confrontation with police officers, Monahan prevented Silva from

continuing to film their conduct and removed the content that was previously

recorded.

Defendants contend that Silva's filming at the scene was prevented "only

after the Plaintiff purposely and continuously refused to comply with simple

instructions by the officers" and "when it became necessary to handcuff him."

Defs.' Br. in Supp. of Mot. for Summ. J. [Doc. 49] ("Defs.' Br.") at 16; Defs.'

Reply Br. in Supp. of Mot. for Summ. J. [Doc. 62] ("Defs.' Reply") at 10-11.

Monahan testified that Silva was being "disorderly" by yelling when Smith was

giving him commands.  Dep. of Clint Monahan taken Mar. 15, 2017 [Doc. 57]

("Monahan Dep.") at 34.  Monahan stated that he told Silva to put his phone down and was "going to try and arrest him" but they went to the ground.  Id. at 35-36. Monahan contends that, after placing Silva in handcuffs, he picked up Silva's phone "to look for any damage" but did not attempt to watch the videos or delete any content.  Id. at 36-37.  As stated above, the decision as to whether a defendant's conduct violated a constitutional right for purposes of the imposition of qualified immunity is based upon the plaintiff's version of the facts.  Lee, 284 F.3d at 1194.  In this case, qualified immunity must be denied to Monahan because if Silva's version of events is accepted, Monahan violated Silva's constitutional right to record police conduct, a right that was clearly established at the time of the incident.  Monahan's version of events is different from that related by Silva, which creates a genuine disputed issue of material fact as to whether Monahan prevented Silva from filming the conduct of the police officers.

Consequently, Defendants' Motion for Summary Judgment as to Count One of Silva's Complaint against Monahan in his individual capacity is **DENIED**.

### b.  Count Two (Violation of the Fourth and Fourteenth Amendments)

Although pled as a single count, Silva's Count Two is really three claims brought under the Fourth and Fourteenth Amendments—claims that Monahan

(1) illegally searched Silva's phone; (2) arrested Silva without probable cause; and

(3) used excessive force against Silva.  The Court will address each separately.

### i.     Whether Monahan Illegally Searched Silva's Phone

At his deposition, Silva testified that, after Monahan pushed him to the

ground and handcuffed him, he saw Monahan "mess[ing]" with his phone and

repeatedly asked Monahan to place it in his pocket.  Silva Dep. at 39-44.  Silva

further testified that he later tried to show Smith the videos as she transported him

to jail, but that Smith could not find either on Silva's phone; instead, it was only

after Silva instructed Smith how to access his email[5] that she was able to view the

recording of Silva's interaction with Sundseth.[6]  Silva Dep. 35, 46-49, 53.  Silva

represents that he was able to recover the second video with the assistance of an

---

[5] Silva testified that he forwarded the first video to his email account in the time
between when the two videos were recorded.  Silva Dep. at 35, 48.

[6] It is unclear from the record before the Court whether Smith corroborates this
account, although it appears she does not.  In a declaration submitted by
Defendants, Smith states in relevant part:

> Mr. Silva gradually calmed down and said he wanted to show me
> proof of what happened.  <u>Mr. Silva then gave me the passcode to his
> phone and I watched two (2) videos.</u>  I confirmed that Ms. Sundseth
> did get out of her car and tell Mr. Silva to stop recording her.  I did
> not, however, see Mr. Silva block Ms. Sundseth's path to her vehicle.

Smith Decl. ¶ 32 (emphasis added).

AT&T employee who informed him how to restore the video from what Silva

refers to as the "deleted file" on his phone. Id. at 50-52.[7] This would amount to

circumstantial evidence that Monahan somehow deleted the videos prior to Silva

retaking custody of the phone.

To counter this evidence, Defendants rely on the testimony of Monahan,

who denies accessing Silva's phone or deleting any videos from it. Monahan Dep.

at 36-37. Monahan maintains that Silva's assertion that Monahan attempted to

access information on Silva's phone or that the videos had to be restored is

implausible because Monahan merely picked up Silva's phone after it fell from

Silva's hands to inspect it for damage. See Defs.' Br. at 23-24; see also Monahan

Dep. at 35-37.[8]

This Court cannot weigh whether Silva's or Monahan's testimony is more

credible. See Anderson, 477 U.S. at 255 ("Credibility determinations, the

---

[7] In support of this claim, Silva has submitted the affidavit of Diana Rivera, an
AT&T employee. See Aff. of Diana Rivera [Doc. 61-7]. In her affidavit, Rivera
states that sometime in April 2015, Silva (an AT&T customer) called her to report
that a video had been erased from his phone, and explained that he needed
assistance restoring it. Id. ¶ 2. Rivera represents that she "talked with
. . . Silva over the telephone and explained to him the necessary steps to take . . . to
restore the erased video recording." Id. ¶ 3.

[8] Smith states that she "did not observe anything after Mr. Silva was handcuffed
indicating to me that Officer Monahan attempted to either view or delete anything
on Mr. Silva's cell phone." Smith Decl. ¶ 24.

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions[.]"). The only issue for the Court to decide is whether Monahan is entitled to qualified immunity if, in fact, a jury found that he accessed information from Silva's cell phone and deleted it. Accordingly, the Court must resolve whether the law clearly established at the time of the incident that such conduct was unlawful.

The Supreme Court in Riley v. California, 134 S. Ct. 2473 (2014), reviewed whether an officer may search a cell phone seized incident to an arrest without a warrant. In finding that such a search was illegal, the Court analyzed the traditional justifications for allowing warrantless searches incident to arrest and found that those traditional rationales, including loss of evidence or a concern that the arrestee may be armed, did not apply. Id. at 2485-88. The Court then explained what a unique device a cell phone was from a storage standpoint, and noted that "cell phones differ in both a quantitative and a qualitative sense from other objects that may be kept on an arrestee's person." Id. at 2489. The Court concluded by stating that "[o]ur holding, of course, is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search, even when a cell phone is seized incident to arrest." Id. at 2493.

Therefore, it was clearly established at the time of the incident in this case in April 2015 that the contents of a cell phone could not be searched incident to arrest without a warrant. It is undisputed that Monahan had no warrant to search Silva's cell phone. Defendants argue that Monahan is entitled to qualified immunity because, in light of the record before the Court, it is simply implausible that Monahan accessed Silva's cell phone after picking it up from the ground. See Defs.' Br. at 23 ("[T]he only plausible conclusion to draw from the actual facts (while appropriately discounting Plaintiff's unfounded speculation) is that by the time Officer Monahan was even able to look at the phone it had locked and Officer Monahan neither looked for nor accessed any of the phone's content."). As stated above, this Court cannot weigh the factual assertions of the parties on summary judgment and, in fact, must determine whether qualified immunity applies based upon Silva's version of the facts. Because a genuine dispute of material fact exists as to whether Monahan accessed Silva's cell phone and then deleted the videos, Monahan is not entitled to qualified immunity.

Accordingly, Defendants' Motion for Summary Judgment is **DENIED** as to Silva's Count Two against Monahan in his individual capacity with respect to Silva's allegation that Monahan illegally searched his phone.

### ii.     Whether Monahan Had Probable Cause to Arrest Silva

Next, Defendants contend that Monahan is entitled to qualified immunity on Silva's false arrest claim because Monahan had arguable probable cause to arrest Silva for obstruction. "Law enforcement violates a person's Fourth Amendment rights when it arrests him or her without probable cause, and a claim arises under § 1983." Rushing v. Parker, 599 F.3d 1263, 1265 (11th Cir. 2010). However, "probable cause constitutes an absolute bar to both state and § 1983 claims alleging false arrest" and false imprisonment. Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998).

"For probable cause to exist, an arrest must be objectively reasonable based on the totality of the circumstances." Wood v. Kessler, 323 F.3d 872, 878 (11th Cir. 2003) (internal punctuation and quotation marks and citation omitted). "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Id. (internal quotation marks and citation omitted). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Jeanty v. City of Miami,

876 F. Supp. 2d 1334, 1342 (S.D. Fla. 2012) (citing Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001)).

The absence of probable cause to arrest does not end the inquiry because "officers who make an arrest without probable cause are entitled to qualified immunity if there was arguable probable cause for the arrest." Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004) (citation omitted); see also Grider v. City of Auburn, 618 F.3d 1240, 1256 (11th Cir. 2010) (citations omitted) (holding that the test for establishing arguable probable cause is whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff."). "When the facts are not in dispute, whether probable cause existed is a question of law, and summary judgment is appropriate." Marx v. Gumbinner, 905 F.2d 1503, 1506 (11th Cir. 1990). "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010). To receive qualified immunity when a plaintiff alleges an arrest in violation of the Fourth Amendment, an arresting officer must show at least "arguable probable cause to believe that a

30

person is committing a particular public offense." Redd v. City of Enterprise, 140

F.3d 1378, 1384 (11th Cir. 1998). "In wrongful arrest cases, we have defined the

'clearly-established' prong [for purposes of applying qualified immunity] as an

'arguable probable cause' inquiry." Moran v. Cameron, 362 F. App'x 88, 93 (11th

Cir. 2010).

Arguable probable cause is to be assessed "based on the information known

to [the] defendant[] at the pertinent times." Shew v. Horvath, 2017 WL 4417592,

at *2 (11th Cir. Oct, 4, 2017). The Court should ask whether "reasonable officers

in the same circumstances and possessing the same knowledge as the Defendants

could have believed that probable cause existed to arrest Plaintiff." Grider, 618

F.3d at 1257 (citation omitted). Because arguable probable cause looks to whether

the arresting officer's actions were objectively reasonable, the officer's underlying

intent or motivation is irrelevant. Lee, 284 F.3d at 1195. This standard

acknowledges that "law enforcement officials will in some cases reasonably but

mistakenly conclude that probable cause is present, and in such cases those

officials should not be held personally liable." Brescher v. Von Stein, 904 F.2d

572, 579 (11th Cir. 1990) (quotation marks and citation omitted, alterations

accepted). Whether an arresting officer possesses arguable probable cause depends

on the elements of the alleged offense and the facts of the case.  Skop v. City of

Atlanta, 485 F.3d 1130, 1137-38 (11th Cir. 2007).

Defendants argue that Monahan had arguable probable cause to arrest Silva

for obstruction of a police officer, which is committed if the arrestee "knowingly

and willfully obstructs or hinders any law enforcement officer in the lawful

discharge of his or her official duties[.]" O.C.G.A. § 16-10-24(a).  The essential

elements of misdemeanor obstruction under § 16-10-24(a) are "that the act

constituting obstruction or hindering must be knowing and willful, and that the

officer must be lawfully discharging his official duties at the time of such act."

Weidmann v. State, 222 Ga. App. 796, 797 (1996) (citation omitted).[9]  Although

words alone can constitute obstruction, the conduct must rise to the level of

knowing and willful opposition to the officer.  Stryker, 297 Ga. App. at 495;

Turner v. Jones, 415 F. App'x 196, 199 (11th Cir. 2011) (footnotes omitted).  An

obstruction conviction cannot be based solely "upon a defendant's act of speaking

---

[9] A variety of conduct can satisfy the obstruction element of § 16-10-24(a), such
as: belligerent refusal to comply with officer's reasonable instructions, see Draper
v. Reynolds, 369 F.3d 1270, 1277 (11th Cir. 2004); telling a friend to disobey an
officer's order, see Stryker v. State, 297 Ga. App. 493, 494 (2009); unleashing a
string of profanities, obstinately refusing to go to jail, and purposefully turning
away from an officer to avoid being handcuffed, see Leckie v. State, 231 Ga. App.
760 (1998); flight from arrest, see Walker v. State, 228 Ga. App. 509, 511 (1997);
or lying with intent of misdirecting officer as to performance of official duties, see
Duke v. State, 205 Ga. App. 689 (1992).

to, remonstrating with, or even criticizing an officer during the performance of his duties." Harris v. State, 314 Ga. App. 816, 820 (2012). The important question for the determination of whether probable cause existed to arrest Silva is what facts and circumstances were within Monahan's knowledge prior to the arrest, viewing the evidence most favorably to Silva as is required on a review of Defendants' motion for summary judgment. Bell v. Delta Air Lines, No. 1:05-CV-1057-JOF, 2006 WL 739431, at *6 (N.D. Ga. Mar. 21, 2006).

Defendants maintain that the "undisputed evidence" in the record establishes that (1) Silva was "approached by Officer Monahan and Officer Smith for the purpose of handcuffing him to maintain order and safety at the scene;" (2) handcuffing Silva was appropriate in light of his "continuing disruption" of officers' attempts to interview Sundseth and his "unwillingness to comply with even the most simply [sic] instructions;" and (3) Silva responded to the officers' "reasonable actions . . . by fighting and resisting Officer Monahan's attempt to handcuff him[.]" See Defs.' Br. at 19-20. At his deposition, Monahan testified that he decided that Silva "need[ed] to be in handcuffs right now" after overhearing Silva continuing to argue with Smith once Silva was seated in his van, and that Silva resisted him and "just started wrestling" after Monahan "told him to put his phone down until [he could] put him in handcuffs[.]" Monahan Dep. at 23. Smith

also stated in her declaration that, although she and Monahan "instructed [Silva]

multiple times to get inside his vehicle, he refused to do so[,]" and that Silva

"yelled that he was not going to get in his vehicle and that he did not have to do as

he was instructed." Smith Decl. ¶ 15; see generally Second Silva Video. In

response, Silva asserts generally that Monahan lacked arguable probable cause to

arrest him because "it was obvious from the moment he arrived that Silva had done

nothing wrong," and that he "posed no danger to the officers or anyone else." Pl.'s

Opp'n at 7-8.

As noted above, under Georgia law, "a person who knowingly and willfully

obstructs or hinders any law enforcement officer in the lawful discharge of his

official duties is guilty of a misdemeanor." O.C.G.A. § 16-10-24(a). "The

essential elements of that crime are: (1) knowingly and willingly obstructing or

hindering, (2) any law enforcement officer, (3) in the lawful discharge of his

official duties." Larkin v. State, 230 Ga. App. 129 (1998).

> Although Georgia courts have held that "words alone can constitute
> obstruction," the Georgia Court of Appeals in Harris v. State reviewed
> Georgia case law and "found no case upholding an obstruction
> conviction based solely upon a defendant's act of speaking to,
> remonstrating with, or even criticizing an officer during the
> performance of his duties." 314 Ga. App. 816, 820 (noting that
> deceiving an officer or interfering with an officer's interview of a
> reporting party may be sufficient to qualify as obstruction). Rather,
> there usually must be "words plus something more." Id. That
> "something more" may be the defendant's "refus[al] to comply with

34

an officer's directive or command" or the defendant's "threatening or violent" behavior. Id.

WBY, Inc. v. DeKalb Cty., 695 F. App'x 486, 492-93 (11th Cir. 2017) (alterations in original).

Defendants emphasize in their briefing that, although Sundseth was ultimately determined to be the initial aggressor in her conflict with Silva, neither Smith nor Monahan knew this at the time they responded to the scene; instead, both were advised by dispatch only that Sundseth had reported that she was being held against her will, that she was at the scene with one or more children, that the other party was walking around her vehicle filming her, and that she was frightened. Defs.' Br. at 8-9, 18-21; see Monahan Dep. 8-10; Smith Decl. ¶ 10. Notwithstanding Silva's claim that it was "obvious from the moment [Monahan] arrived" that he "had done nothing wrong," the videos in the record depict Silva arguing with officers and initially refusing to return to his van despite repeated requests that he do so. Furthermore, Silva does not dispute that officers were engaged in the lawful discharge of their duties at the time he was arrested: both officers testified that it is their practice to first separate parties in such situations so that they can be questioned separately. See Monahan Dep. at 22; Smith Decl. ¶ 14.

On the other hand, the video evidence in this case establishes that, immediately before being arrested for obstruction, Silva had in fact complied with

35

officers' requests and was in his van—and that it was Monahan who affirmatively

requested that Silva leave his vehicle, approach him, and put his phone down.  See

Second Silva Video at 00:01:15-00:01:22; Compl. ¶ 19.[10]  The video also shows

that, after initially refusing to put his phone down, Silva immediately asked

Monahan "[w]hy am I going to put my phone down?"  Second Silva Video at

00:00:01:22-00:01:30.  Without making another request or informing Silva that he

was going to place him in handcuffs, Monahan appears to grapple with Silva,

telling Silva to "stop resisting."  Id. at 00:00:01:24-00:01:37.

---

[10] Defendants repeatedly mischaracterize the record by alleging that Silva walked back towards Monahan in spite of officers' direction that he stay in his van.  See Defs.' Br. at 7 ("As Officer Smith turned to walk back towards Officer Monahan, Plaintiff once against exited his van."); Defs.' Reply at 6 ("In truth, however, what Plaintiff did was . . . after a very few moments of sitting, get back up and head towards the officers again defying their simple instructions to remain in his van.") (emphasis added); see Smith Decl. ¶¶ 18-19 ("As I turned to walk back towards Officer Monahan, Officer Monahan again approached Mr. Silva as he was now out of his van and still not complying with our instructions.  With Mr. Silva still refusing to stay in his van so that Officer Monahan and I could commence our investigation . . . Officer Monahan approached Mr. Silva and attempted to place him in handcuffs.").  The video record contradicts these accounts.  See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (holding that, when the nonmoving party's version of the facts is contradicted by the record such that no reasonable jury could believe the nonmoving party's version, the court must not adopt that version of the facts in ruling on summary judgment; instead, where video evidence is at issue, the court must "view[] the facts in the light depicted by the videotape."); see also Jackson v. Beard, No. 3:CV-09-2129, 2015 WL 1321721, at *17 (M.D. Pa. Mar. 24, 2015) (finding that videotape evidence contradicted prisoner's claim that he was emaciated).

Although Defendants characterize Monahan's handling of this interaction as "reasonable" and argue that Silva "fought and resisted" Monahan's attempts to handcuff him, see Defs.' Br. at 20, the video gives no indication that Silva knew he was being placed under arrest—much less that he knew Monahan was attempting to handcuff him—until Monahan actually attempted to seize Silva's phone. Instead, it appears that Silva did little more than initially refuse to put his phone down, then ask Monahan why he was being required to do so; furthermore, Silva disputes subsequently trying to stop Monahan from putting handcuffs on him or otherwise resisting arrest, and it is unclear from the video whether he did so. Silva Dep. at 43-45.

As noted above, there are no Georgia cases "upholding an obstruction conviction based solely on a defendant's act of speaking to, remonstrating with, or even criticizing an officer during the performance of his duties." WBY, Inc., 695 F. App'x at 492-93 (quoting Harris, 314 Ga. App. at 820). Although the Court of Appeals of Georgia has recognized that "words plus something more" may be sufficient to sustain an obstruction conviction, see Harris, 314 Ga. App. at 821 (collecting cases in which, among other things, a defendant's act of "arguing, . . . refusing to comply with instruction to take written citation, and attempting to walk away when officer told defendant she was under arrest" was found sufficient to

37

uphold an obstruction conviction), it is not clear from the record that Silva's refusal to immediately put his phone down was, absent more, anything other than a "mere failure to immediately respond" to Monahan's command. See WBY, Inc., 695 F. App'x at 493 (concluding that party's "mere failure to immediately respond" to officer's command that he "back down" was insufficient to show obstruction); see also Coley v. State, 178 Ga. App. 668, 668 (1986) (holding that defendant's failure to respond immediately to police officer's orders, where defendant was committing no other offense and made no verbal or physical threats against the officer, was insufficient to support defendant's conviction for obstruction.); see also Skop, 485 F.3d at 1139 ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.") (quoting Houston v. Hill, 482 U.S. 451, 461-63 (1987)).

Indeed, although Monahan represented in a supplemental incident report associated with Silva's arrest that he "walked up to [Silva] and told him to put his hands behind his back," see Incident Report at 9 (emphasis added), and although Smith represented in her own report that she deemed it "necessary as a safety precaution" to place Silva in handcuffs due to his "inability to follow lawful commands and his disorderly actions for a constant 15 minutes," see id. at 3

38

(emphasis added), the video record establishes that little more than a minute and a half elapsed between the officers' arrival and when Silva was handcuffed, and that Silva was never told to put his hands behind his back before Monahan attempted to handcuff him. Finally, neither officer claims to have viewed Silva as a threat, and Monahan admitted at his deposition that Silva was not threatening violence (and did not appear to have a weapon) in the moments preceding his arrest. See Monahan Dep. at 29-30.

There is a jury question as to whether Monahan had arguable probable cause to arrest Silva. Based on the record, the Court cannot conclude as a matter of law that "reasonable officers in the same circumstances and possessing the same knowledge as [Monahan] could have believed that probable cause existed to arrest Plaintiff." Brescher, 904 F. 2d at 579. Because there are genuine disputed issues of material fact, the Court holds that Monahan is not entitled to qualified immunity. See Kingsland, 382 F.3d at 1233 (holding that because of the factual disputes in the case, without further fact finding, it would be impracticable for the court to conclude that arguable probable cause existed for Plaintiff's arrest); Thompson v. Hall, 479 F. App'x 243, 247 (11th Cir. 2012) (concluding that a reasonable jury could find that the deputy did not possess arguable probable cause to arrest the plaintiff); Barnes v. DeKalb Cty., Ga., 898 F. Supp. 2d 1317, 1322

39

(N.D. Ga. 2012) (holding that disputed factual issues precluded a determination that arguable probable cause existed as a matter of law).

For all of the foregoing reasons, Defendants' Motion for Summary Judgment is **DENIED** as to Silva's Count Two against Monahan in his individual capacity with respect to Silva's allegation that Monahan arrested him without probable cause.

### iii.    Whether Monahan Used Excessive Force

Next, Defendants argue that Monahan is entitled to qualified immunity on Silva's excessive force claim because the amount of force Monahan used to arrest Silva was objectively reasonable.  "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  Graham v. Connor, 490 U.S. 386, 395 (1989). Whether the force was "reasonable" "requires balancing of the individual's Fourth Amendment interests against the relevant government interests."  Cty. of Los Angeles v. Mendez, 137 S. Ct. 1539, 1546 (2017) (citing Graham, 490 U.S. at 396).  "The operative question in excessive force cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'"  Id. (quoting

Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)).  As the Supreme Court recently

explained,

> The reasonableness of the use of force is evaluated under an objective
> inquiry that pays careful attention to the facts and circumstances of
> each particular case.  And the 'reasonableness' of a particular use
> of force must be judged from the perspective of a reasonable officer
> on the scene, rather than with the 20/20 vision of hindsight.
> Excessive force claims . . . are evaluated for objective reasonableness
> based upon the information the officers had when the conduct
> occurred.  That inquiry is dispositive: When an officer carries out a
> seizure that is reasonable, taking into account all relevant
> circumstances, there is no valid excessive force claim.

Id. at 1546-47 (citations and quotations omitted).  The Eleventh Circuit has

identified three factors to evaluate for determining if the force used by an officer in

making an arrest was objectively reasonable: "(1) the need for the application of

force, (2) the relationship between the need and amount of force used, and (3) the

extent of the injury inflicted."  Stephens v. DeGiovanni, 852 F.3d 1298, 1324 (11th

Cir. 2017) (citing Vinyard, 311 F.3d at 1347).

Under Eleventh Circuit law, a claim that any force in an illegal stop or arrest

is excessive is subsumed in the illegal stop or arrest claim and is not a discrete

excessive force claim.  Jackson v. Sauls, 206 F.3d 1156, 1171 (11th Cir. 2000)

(citing Williamson v. Mills, 65 F.3d 155, 158-59 (11th Cir. 1995) (holding that a

claim that any force during a false arrest is excessive is subsumed in the false arrest

claim itself because damages for false arrest include damages for use of force to

41

effect that false arrest)).  The Court has found that a question of fact exists as to whether Monahan had arguable probable cause to arrest Silva for obstruction—and thus as to whether Silva's arrest was legal.  Were a jury to find that Silva's arrest was illegal, then any use of force to effect that arrest, however minimal, was more than reasonably necessary and therefore excessive.  For this reason, the Court is unable to determine whether Monahan is entitled to qualified immunity on Silva's excessive force claim at this time.

Furthermore, assuming *arguendo* that Silva's arrest was legal, the Court nevertheless finds that there is a jury question as to whether Monahan used excessive force in effecting that arrest.  Viewed in the light most favorable to Silva, the evidence shows that, at the time of arrest, Monahan approached Silva, put his "two arms . . . on [Silva's] arm," then pushed Silva to the ground, causing Silva's head to strike the pavement "real hard."  Silva Dep. at 41-42.  Monahan then grabbed Silva's right arm before handcuffing him, in the process dislocating Silva's shoulder and causing injury.  Id. at 41-43, 54-55, 57-60.  Silva denies trying to stop Monahan from handcuffing him or resisting arrest.  Id. at 43-44.

Defendants argue that Monahan used only that force necessary to take Silva into custody, and maintain that Silva was "taken to the ground because he violently resisted Officer Monahan's attempts to turn him around and handcuff him, thereby

42

forcing Officer Monahan to use greater force." Defs.' Reply at 7; see Defs' Br. at 17-18. While "some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense," Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003), the force used by a police officer in carrying out an arrest must nevertheless be "reasonably proportionate to the need for that force," Lee, 284 F.3d at 1198. Based on the record and Silva's version of the facts, there is evidence which could lead a fact finder to determine that Silva did not resist Monahan. There is also no indication from the record that Silva was ever informed he was being placed under arrest before he was seized and pushed to the ground, or that Monahan at any point believed that Silva posed an immediate threat of serious harm to anyone present at the scene. On this record, the Court finds that a reasonable jury could find Monahan's use of force was excessive.

Furthermore, even if Monahan used excessive force in lawfully arresting Silva, he would not be entitled to qualified immunity on the ground that the law was not clearly established at the time of the incident that such force was excessive. Lee, 284 F.3d at 1198. The Eleventh Circuit has clearly held that "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force," Hadley, 526 F.3d at 1330, and has "repeatedly ruled that a police

officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." Saunders v. Duke, 766 F.3d 1262, 1265 (11th Cir. 2014) (collecting cases); see Landsman v. City of Vero Beach, 621 F. App'x 559, 563 (11th Cir. 2015) ("There is a broad statement of principle ensconced in our case law that clearly establishes that the use of force against an arrestee who, *inter alia*, is not a threat, has not exhibited aggressive behavior, and has not actively resisted arrest is excessive."). Construing the facts in the light most favorable to Silva, "no particularized preexisting case law was necessary for it to be clearly established that what [Monahan] did violated [Silva's] constitutional right to be free from the excessive use of force" in his arrest. Priester v. City of Riviera Beach, 208 F.3d 919, 927 (11th Cir. 2000); see Stephens, 852 F.3d at 1327-28 (concluding that deputy's use of force during arrest was clearly excessive where arrestee was under control, not resisting, and obeying commands). However, the Court's present conclusion does not mean that Monahan will ultimately not be entitled to immunity; the jury's subsequent findings as to the nature and extent of Monahan's use of force may lead it to revisit the issue of whether such force was "patently unreasonable." Landsman, 621 F. App'x at 563 (quoting Smith v. Mattox, 127 F.3d 1416, 1420 (11th Cir. 1997)).

For all of the foregoing reasons, Defendants' Motion for Summary Judgment is **DENIED** as to Silva's Count Two against Monahan in his individual capacity with respect to Silva's allegation that Monahan used excessive force.

### B.   Silva's State Law Claims (Counts Three and Four)

#### 1.   Official Capacity Claims—All Defendants

Both the County and Monahan argue that Silva's state law claims against them in their official capacities in Counts Three and Four are barred by sovereign immunity.  "Under the Georgia Constitution, the protection of sovereign immunity extends to the state and all of its departments, including counties, and thus protects county employees who are sued in their official capacities unless sovereign immunity has been waived."  Jobling v. Shelton, 334 Ga. App. 483, 486 (2015) (internal quotation marks and citation omitted); see also GA. CONST. art. I, § II, ¶ IX(e); Pearce v. Tucker, 299 Ga. 224, 225 n.2 (2016) ("While suits against public employees in their personal capacities involve official immunity, suits against public employees in their official capacities are in reality suits against the state and, therefore, involve sovereign immunity.") (quoting Donaldson v. Dep't of Transp., 262 Ga. 49, 56 (1992)).  "Any waiver of sovereign immunity must be established by the party seeking to benefit from that waiver."  Jobling, 334 Ga. App. at 485-86 (internal punctuation and citation omitted).  "A lawsuit against a

45

[law enforcement officer] in his official capacity is considered a suit against the county, and the [officer] is entitled to assert any defense or immunity that the county could assert, including sovereign immunity." Strength v. Lovett, 311 Ga. App. 35, 38 (2011).

Silva argues that a question of fact exists as to whether Defendants have waived their official immunity through the purchase of liability insurance. Under Georgia law, "[a] municipal corporation shall not waive its immunity by the purchase of liability insurance. . . unless the policy of insurance issued covers an occurrence for which the defense of sovereign immunity is available, and then only to the extent of the limits of such insurance policy." O.C.G.A. § 36-33-1; see Carter v. Butts Cty., 821 F.3d 1310, 1323 (11th Cir. 2016) ("Georgia law allows a county to waive immunity through the purchase of liability insurance for which the defense of sovereign immunity would otherwise have been available[.]") (citing O.C.G.A. § 36-33-1). In support of this claim, Silva relies on Defendants' somewhat confusing statement in their Initial Disclosures that:

> Defendants are not insured for this matter. Cobb County maintains its own Risk Management Department and administers claims against it pursuant to O.C.G.A. § 45-9-21, *et seq*. Cobb County has [a] specific Public Officials Liability Policy which may or may not apply [in this action].

46

Defs.' Initial Disclosures [Doc. 14] at 8-9 (emphasis added).[11] Defendants did not

attach Cobb County's Public Officials Liability Policy to their Initial Disclosures

(nor have they subsequently produced this policy), and do not address this

argument in their briefing. See Hudson v. Norfolk S. Ry. Co., 209 F. Supp. 2d

1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or

otherwise address a claim, the Court deems such argument or claim abandoned.")

(citing Resolution Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)).

The Court agrees with Silva that, at a minimum, a question of fact exists as

to whether Defendants have waived their official immunity through the purchase of

liability insurance. Accordingly, Defendants' Motion for Summary Judgment is

**DENIED** with respect to Silva's Counts Three and Four against the County and

Monahan in their official capacities.

### 2.    Individual Capacity Claims—Officer Monahan

Counts Three and Four of the Complaint allege state law claims for false

imprisonment and false arrest, respectively. Georgia law defines the tort of false

imprisonment as "the unlawful detention of the person of another, for any length of

time, whereby such person is deprived of his personal liberty." O.C.G.A. § 51-7-

---

[11] Defendants' statement was made in response to Silva's request that Defendants produce "any insurance agreement under which any person carrying on an insurance business may be liable." Id.

20.  Georgia law defines the tort of false arrest as "[a]n arrest under process of law,

without probable cause, when made maliciously[.]"  O.C.G.A. § 51-7-1.

Defendants argue that Monahan is entitled to official immunity on both of

these state law claims.  In relevant part, the Georgia Constitution provides:

> All officers and employees of the state or its departments and agencies
> may be subject to suit and may be liable for injuries and damages . . .
> if they act with <u>actual malice or with actual intent to cause injury</u> in
> the performance of their official functions.  Except as provided in this
> subparagraph, officers . . .  shall not be subject to suit or liability, and
> no judgment shall be entered against them, for the performance or non
> performance of their official functions.

GA. CONST., art. I, § 2, ¶ IX(d) (emphasis added).

As explained above, there is no dispute that Monahan was acting within his

discretionary authority when he arrested Silva.  "Unlike qualified immunity under

federal law, we must inquire into [the public agent's] subjective intent to determine

whether he has official immunity under Georgia law."  <u>Jordan v. Mosley</u>, 487 F.3d

1350, 1357 (11th Cir. 2007).  Specifically, a public agent loses the protection of

official immunity if the agent acted with "actual malice or intent to injure."

<u>Cameron v. Lang</u>, 274 Ga. 122, 549 S.E.2d 341, 345 (2001).  "Actual malice"

refers to "a deliberate intention to do wrong," which is more than simply "reckless

disregard for the rights or safety of others."  <u>Murphy v. Bajjani</u>, 282 Ga. 197, 203

(2007) (quoting <u>Merrow v. Hawkins</u>, 266 Ga. 390, 391-92 (1996)).

Silva contends that a factual dispute remains as to whether Monahan acted with actual malice, and points to his allegations that Monahan (1) deliberately deleted videos from his cell phone, and (2) had his vehicle towed from the front of his home following arrest. See Pl.'s Opp'n at 9; Compl. ¶ 29; Silva Dep. at 54. The Court agrees that, at a minimum, Silva's allegation that Monahan intentionally deleted information from his cell phone evinces "[a] deliberate intention to do wrong such as to constitute the actual malice necessary to overcome official immunity[.]" Selvy, 292 Ga. App. at 704. Once again, there is a genuine disputed issue of material fact that prevents the application of official immunity to bar Silva's state law claims against Monahan in his individual capacity.

Accordingly, Defendants' Motion for Summary Judgment is **DENIED** with respect to Silva's Counts Three and Four against Monahan in his individual capacity.[12]

---

[12] Silva also pleads a claim against Monahan for punitive damages. See Compl. ¶¶ 52-54. Silva alleges that Monahan's actions show "willful misconduct, fraud, wantonness, oppression, and that entire want of care that would raise the presumption of conscious indifference to the consequences" as well as "malice or reckless indifference to Silva's federally protected rights." Id. ¶ 53.

Defendants do not specifically argue that Silva's punitive damages claim should be dismissed. Furthermore, even if they did, that argument would lack merit. "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of

## IV.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Cobb County, Georgia, and Officer Clinton Monahan's Motion for Summary Judgment [Doc. 49] is **GRANTED IN PART and DENIED IN PART**.

Specifically, it is **ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** as to Silva's Counts One and Two against Defendants Cobb County and Officer Clinton Monahan in their official capacities, and **DENIED** with respect to all other claims against both Defendants.

It is further **ORDERED** that the parties file their consolidated proposed pretrial order within thirty (30) days of the date of this Order.

---

others." Smith v. Wade, 461 U.S. 30, 56 (1983). "In the context of a § 1983 claim, the standard for reckless disregard is a deliberate indifference to a civilian's rights." Vassilev v. City of Johns Creek, No. 1:14-CV-0312-LMM, 2015 WL 12591737, at *11 (N.D. Ga. Sept. 29, 2015) (citing Farmer v. Brennan, 511 U.S. 825, 836 (1970)). Silva's allegations that Monahan violated his First, Fourth, and Fourteenth Amendment rights by, among other things, searching his phone without probable cause, deleting videos from his phone, arresting him without probable cause, and using excessive force, creates a question of fact for the jury as to whether Monahan's conduct reached the level of deliberate indifference. See id. (concluding that plaintiff's allegation that he was arrested without probable cause was sufficient to create a question of fact as to whether police officer acted with deliberate indifference sufficient to warrant punitive damages).

**IT IS SO ORDERED** this 4th day of January, 2018.

MARK H. COHEN
United States District Judge